C. E. WILLIAMSON MANUFACTURING COMPANY, Appellant,

v.

Paul ARNOLD et al., d/b/a the Perry-Leslie Stave Co., Appellees.

Court of Appeals of Kentucky.

Oct. 26, 1956.

W. E. Faulkner, Faulkner & Faulkner, Hazard, for appellant.

S. M. Ward, Hazard, for appellees.

CLAY, Commissioner.

This controversy arose out of a contract for the manufacture of whiskey barrel staves. The jury allowed appellee plaintiffs approximately $3,000 on their claim and allowed defendant appellant $800 on its counterclaim. Defendant asks reversal of the judgment on the ground that the verdict was contrary to the evidence.

In the fall of 1951 the parties entered into an agreement whereby plaintiffs would manufacture and sell to defendant what are described as "bourbon staves" and "oil staves". A written contract was drafted under the terms of which plaintiffs agreed to produce, sell and deliver to defendant in 1951 200,000 bourbon staves and in addition such oil staves as were developed in the manufacture of the bourbon staves. The price was $600 per thousand for the bourbon staves and $65 a thousand for the oil staves. This written contract was not signed by defendant, but both parties performed in accordance with some of the terms thereof.

By the end of 1951 plaintiffs had produced and delivered to defendant 68,000 bourbon staves and defendant had paid the agreed price therefor. Soon thereafter the market price for bourbon staves took a substantial drop and plaintiffs went out of business. In the spring of 1952 plaintiffs had on hand some 58,000 oil staves, including a substantial number of culls. Oil staves are those which do not meet the rigid specifications of bourbon staves.

Plaintiffs' claim arises out of the refusal of defendant to inspect, take delivery of, and pay for the remaining oil staves on hand in the early part of 1952. Defendant's principal counterclaim was based on the loss of profits because plaintiffs failed to produce and deliver the full 200,000 bourbon staves called for in the unexecuted written contract.

The evidence for plaintiffs was in substance that at the time production under the contract terminated they had on hand 58,000 staves of various kinds. Under the contract defendant was required to make periodic inspections, and proper inspections had been made for most of the year 1951. Plaintiffs testified, however, that defendant refused to inspect the remaining oil staves until the spring of 1953, and for that reason plaintiffs were unable to make delivery at the contract price of $65 a thou-

sand. When this stock was culled and re-graded in 1953, it was reduced to something over 44,000 staves, and the evidence was that this figure should probably be reduced to 30,000 usable staves. However, plaintiffs' testimony was to the effect that if the staves had been inspected and accepted in the early part of 1952, there would have been over 44,000 oil staves deliverable under the contract.

Defendant introduced a great volume of evidence of a documentary nature consisting of letters, checks and memoranda by which it was apparently attempting to prove it acted in good faith. In addition, defendant introduced proof that in the early part of 1952, and from time to time through June 1953, representatives of companies with whom defendant did business made brief inspections of the stock on hand at plaintiffs' yard. The substance of their testimony was that the oil staves contained an excessive number of culls and for that reason would not be acceptable in the cooperage business. The contract had provided that "oil staves shall be graded out 95 percent or better".

If defendant's evidence was accepted, one could conclude that the oil staves had not been properly graded so as to be acceptable under the contract. On the other hand, plaintiffs' testimony was to the effect that the staves had been properly graded by them and that defendant had not made a proper inspection and simply abandoned its agreement to buy them. Exactly what were the respective obligations of the parties is in dispute. The original contract only covered the year 1951, but the parties extended it by mutual consent and the purchase price of the staves constituted about the only certain terms of the contract. (Even the price of bourbon staves was substantially changed in 1952.)

Considering the evidence as a whole, it is apparent that defendant had agreed to buy all of the usable oil staves developed in the manufacture of bourbon staves. This it refused to do. The factual issue was how many such oil staves plaintiffs had on hand for delivery to defendant. The evidence is not too satisfactory on either side, but we are convinced that the issue was properly submitted to the jury and that there was substantial evidence to support the verdict.

Defendant's principal counterclaim was based upon loss of profits which it would have realized had plaintiffs delivered 200,000 bourbon staves in 1951. It is clear from the evidence, including letters introduced by defendant, that this term of the contract was abandoned by mutual consent of the parties. At least it was a jury question and there was evidence to support the verdict on this issue.

The judgment is affirmed.